

**SIGNED this 17th day of February, 2026**

/s/ Rachel Ralston Mancl
Rachel Ralston Mancl
**UNITED STATES BANKRUPTCY JUDGE**

_____

**[This opinion is not intended for publication as the precedential effect is deemed limited.]**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TENNESSEE**

In re

    NICHOLAS VAUGHN MORRIS,         No. 2:25-bk-50475-RRM
                                                  Chapter 7
                         Debtor.

# M E M O R A N D U M

APPEARANCES:

Dean Greer, Esq.                      Jason L. Rogers, Esq.
Post Office Box 3708             Post Office Box 869
Kingsport, Tennessee 37664    Knoxville, Tennessee 37901
*Attorney for Debtor*              *Attorney for Knoxville TVA Employees Credit Union*

**Rachel Ralston Mancl, United States Bankruptcy Judge.** This case came before the court for an evidentiary hearing on December 11, 2025, on debtor Nicholas Vaughn Morris' motion to avoid the judicial lien of Knoxville TVA Employees Credit Union on his residence jointly owned with Courtney Brianna Hart. The court heard testimony from the debtor, Ms. Hart, and Justin Thomas Briggs, a certified residential appraiser retained by the Credit Union. Photographs of the interior of the residence, Mr. Briggs' curriculum vitae, and Mr. Briggs'

appraisal report were admitted as exhibits. The debtor and the Credit Union filed a joint prehearing statement stipulating certain facts and setting forth the issue to be decided: "Whether the Credit Union's lien impairs the Debtor's exemption in real property and may be avoided pursuant to 11 U.S.C. § 522(h)?" The parties' prehearing briefs narrowed this contested matter to only the value of the debtor's residence. The court in ruling from the bench found the value of the property to be $200,000 and stated that "[i]f an appeal is filed, the court reserves the right to issue a written opinion with Findings of Facts and Conclusions of the Law." The following constitute the court's factual findings and conclusions of law in accordance with Fed. R. Civ. P. 52(a), made applicable by Fed. R. Bankr. P. 7052. This contested matter is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(B) and (K).

I.

The debtor filed the petition commencing this chapter 7 case on April 29, 2025, along with his verified schedules and statements. In schedule A/B the debtor listed real property located at 108 Gilmer Street, Kingsport, Tennessee, and stated that the value of the property was in his "opinion $185,000 at most" because the "[p]roperty has termite issues and water damage." The debtor claimed a homestead exemption of $35,000 in the property in his schedule C. In schedule D the debtor listed Appalachian Community Federal Credit Union as holding a deed of trust on the property securing a loan balance of $114,123. Knoxville TVA Employees Credit Union was also listed in schedule D with a judgment lien on the property in the amount of $17,477.92. In his statement of financial affairs, the debtor indicated that the Credit Union had obtained its judgment for a deficiency balance after the repossession of three vehicles, those being a 2016 Ford Mustang, a 2023 Nissan Sentra, and a 2013 GMC Sierra.

The judgment attached to the debtor's motion shows that on October 9, 2024, the Credit Union filed an action in the General Sessions Court for Sullivan County, Tennessee, to collect "[m]onies owed in the amount of $14,200.05, plus court cost, attorney fees, cost of collection, and interest at the statutory rate." The hearing was set for December 2, 2024, and on that date the debtor and Ms. Hart appeared and agreed to entry of a judgment in the amount of $17,477.92.

The judgment became a lien on their real property when the Credit Union recorded it with the Sullivan County Register of Deeds on December 17, 2024, at Book 3633, page 665.

The debtor and Ms. Hart jointly purchased the property in March 2020 for $129,500, and since then have resided there with their three children. The debtor stated that "[a]round nine months into being there, … the flooding started happening …. It was leaching through the foundation of the house due to not having any moisture barrier, coming though my storage room. And all six rooms downstairs in a fully finished basement had standing ankle-high water overnight." Similar floodings happened on five more occasions before the debtor installed a French drain at a cost of $2,700 for the materials. Installation of a French drain, the debtor said, was a temporary measure to alleviate flooding by diverting water away from the residence through a perforated corrugated pipe using rock both as a base and to cover the pipe. Since installing the French drain about a year ago, the debtor stated that the flooding had not recurred. However, he said that the basement remains damp from water seepage, and his family uses a dehumidifier to remove a gallon and a half to two gallons of water each week. The debtor said that a better remedy to alleviate the flooding would have been to use a water conduit encased in concrete and plumbed into the existing plumbing of the residence, but he could not afford that solution. According to the debtor, he would also have to install a moisture barrier on the foundation to permanently prevent water intrusion. The debtor stated that his knowledge of flooding remediation comes from the experience gained by "remodeling and renovation and home building with my dad for eight years solid, and three years after that fact, off and on." The debtor said much of his work with his father involved forming and setting concrete, working with sheetrock, roofs, and rafters, and lots of painting.

The debtor testified that the flooding had damaged the sheetrock in his basement and that he would need to remove and replace the sheetrock four feet up from the floor in all the rooms downstairs to remove the resulting mold. The debtor stated that the basement is "[l]ivable, but the spores are still there. The mold's still there." In addition to the mold problem, the debtor testified that termites have damaged the residence. The debtor discovered a termite infestation in the residence in the spring after the first year of purchasing the property. The debtor paid McClain pest control to treat the residence for termites, and he spent $3,600 to repair termite damaged walls

and doorframes. However, the infestation recurred the following spring and the damage was repeated. The debtor contacted Terminix but could not afford the treatment recommended by its technician. While at the residence, the Terminix technician sprayed termiticide through a hole in the wall where there is visible termite damage and provided a can of termiticide to the debtor that he sprayed into the wall the following spring. Using photographs as he testified, the debtor pointed out the visible damage to the walls and doorframes caused by termites. The debtor said that the interior damage in one area "is at least to the studs on the opposite side of the wall where the doorframe is that's holding the doorframe." With regard to spraying for termites, the debtor said "I don't know if that's a fix, just like I don't know if the French drain outside was a fix."

The debtor concluded his testimony with his opinion of the property's market value:

Q   As a result of the problems with the house, what is your opinion of the market value of your home?

A   I know we, we have discussed seeing it at 187, but we go back to the date of me signing this for this home, my, my loan. I'm paying one twenty-nine five here. Knowing what I know now, I'da passed on this home. I wouldn't have bought it. So is it going to affect the future selling of the house, of course. And the market value right now as it sits, it's so high, so low. I couldn't sell my home and go buy another home.

Q   But the actual price that you think, at best?

A   I would, I would see it being closer to 160. If somebody really knocked me down and I just wanted out of this house, yeah, they could have it.

Q   Okay.

A   -- personally. 'Cause again, I paid one twenty-nine five. What's somebody else going to pay knowing the damages?

Ms. Hart corroborated the debtor's statements regarding problems with the property from flooding and termite infestations. She added that there is visible staining on the sheetrock from the episodes of flooding and that her family uses moisture absorbers in addition to the dehumidifier to help with the dampness problem. When asked about active mold, Ms. Hart said she assumed it was behind the sheetrock because of the recommendation that the sheetrock be removed and replaced. She also offered her own opinion when asked about the property's market value:

4

A   My own personal opinion, yes. I would assess it at the 185. As far as, like, if it would sell for that, I, you know, I can't say.  But I do know when you do purchase a home, there is a, if you want to say tit-for-tat where you go back and forth, you know, someone might say, "Oh, it's worth 185, but I'll give you 150." They come back and say, "No, I won't take your 150, but I'll offer you 160."

Q   Do you think the bargaining points would be based on the damage to the property?

A   I would say so, yes. And the termite damage.

Mr. Briggs is a Certified Residential Real Estate Appraiser with 17 years' experience and the owner of Tennessee Home Appraisals that operates in East Tennessee and Southwest Virginia. According to Mr. Briggs, the Credit Union retained him "to go to the subject property at 108 Gilmer Street …, observe the property, do basic measurements, and observe readily available areas in the home, photograph such, and then run our analysis and come up with our definition of fair market value for the home."  Mr. Briggs opined the "final estimate of value based on the date of October the 3rd, 2025, was $220,000."  The appraisal report at the conclusion of page 2 likewise lists October 3, 2025, as the date of inspection.  Mr. Briggs states in the "USPAP Addendum" to the appraisal that "[s]ignificant contributions to this report were made by: Curtis Bowen (TN Trainee Appraiser License #6058, Expiration date 09/23/2025) who was the sole individual performing the appraisal site visit[.]"  Nothing was said during the hearing about the expiration of Mr. Bowen's license on September 23rd, prior to his October 3rd site inspection, or his licensure status at the time he made the inspection.  In any event, Mr. Briggs' knowledge of the property's defects was dependent on the observations of Mr. Bowen as Mr. Briggs did not visit the property himself.

Mr. Briggs' report indicates that the residence is a split foyer design built over 30 years ago in 1994.  On the lower portion of the exterior, the foundation walls are of concrete block construction with the areas above ground covered by brick.  The upper portion of the exterior walls are wood framed covered by vinyl.  The interior of the upper portion is 887 square feet consisting of two bedrooms, one bathroom, and an area for the living/dining room and kitchen. The basement is finished with two bedrooms, a laundry/bathroom, and a family room.  Two photographs are included in the report with the following notations: "There appears to be termite

5

damage in basement – however the appraiser is NOT an expert in that field and further investigation would be prudent." The report itself states:

> This appraisal is developed under the extraordinary assumption that the damage observed in the subject's basement is the result of an extensive termite infestation. The estimated cost to cure this condition is approximately $20,000, which has been addressed on the Sales Grid under the "Cost to Cure" adjustment line.

When asked during his direct examination if there were "[a]ny negative assumptions with the property," Mr. Briggs further explained:

> A   There, there were. It, it was observed that there's what appears to be termite damage throughout the home. That damage appears to be quite significant. Because of our observing that feature or factor, we did have to address that the best we could and in this case utilized a cost-to-cure adjustment, which is the industry standard.
>
> Q   Now that cost to cure you reference, is that information located in the bottom of page 3 in this report?
>
> A   Yes, sir, it is. It's near the bottom of the, page 3 and also referenced on the next page as well.
>
> Q   And what is the cost to cure that you factored into your estimate of value of the property?
>
> A   Yes, sir. The cost to cure is overall an estimate to, to help with kind of just looking at the overall marketability of the subject property and what it would bring on the open market. We need to do a cost to cure to keep it in line with market expectations and to value it accordingly to what we think someone would pay for the home because of its deferred maintenance in this case. Deferred maintenance just meaning any condition that would require repair, which in this case would be that termite damage.
>
> Q   And what was the cost to cure that was factored into your analysis?
>
> A   $20,000.
>
> Q   Now does that $20,000 just include remediation of possible termites or does that include other factors?
>
> A   This does not just include remediation. It's an estimate of the overall market impact on the home.

6

On cross-examination Mr. Briggs stated that the debtor's residence, like any property that is purchased, will have unknown damage, and that a "cost to cure" is "my best attempt as a professional to take into consideration not just the remediation of this issue in keeping with the home, the home's pricing, market expectations, but also to take into account the entrepreneurial incentive to do such." Mr. Briggs was asked to explain what he meant by entrepreneurial incentive:

> A  No one wants to fix an issue for free. Anytime there is an issue, no matter the extent, we like to build in some entrepreneurial incentive, which is just incentive for a party to come in and do the work.
>
> Q  That's not a, that's just an, some sort of estimate you apply to your overall numbers, but it's not based on actual cost of repair?
>
> A  No.
>
> Q  Or --
>
> A  It would be incorrect in, in any residential appraisal valuation to say it's a straight cost of repair. That's, that's not accurate. That's --
>
> Q  Okay.
>
> A  -- not what we do.
>
> Q  So, but basically, then, the $20,000 is just some sort of an estimate, but not based on what it would cost to actually repair any damage?
>
> A  That's incorrect. It's definitely taken into consideration and I have in my work file different estimates and, and printouts based on termite damage, which is often very similar to foundation damage, which is similar to water intrusion. All of those types of issues have a generalized cost-to-cure adjustment that can be applied with reasonable certainty.
>
> Q  And, and all of these things that you've mentioned are, are negative market conditions?
>
> A  They are, yes.
>
> Q  They reduce the price down?
>
> A  Yes, they do.

Mr. Briggs' cross-examination ended with debtor's attorney returning to the question of whether the termite infestation cost to cure estimate was adequate to reflect a reduction in the market value and if any problems other than the termite damage were considered in the appraisal:

> Q   Would you agree that visible termite damage is going to be a very serious negative factor to a potential buyer because you don't know how much damage there is?
>
> A   Typically, it is a significant issue.
>
> Q   And despite all that, this house is still worth $220,000?
>
> A   Yes, sir.
>
> Q   Did you take into consideration anything other than termite damage?
>
> A   Anytime we see termite damage, we are assuming that there's some potential moisture issues and/or that there have in the past been some moisture issues. Termites typically, and I'm not an expert, but from what experts have told me termites typically follow water.

So if we're seeing visible signs of termites like exhibited in these photos, we can assume there's some moisture issues. Now that could be as small as, you know, fixing guttering and putting a dehumidifier in a basement. It could be as large as exterior renovation excavation. It could, could get extensive. It's just hard to know.

> Q   So beyond the, the estimate you made for termite damage, did that also include the water potential damage, potential mold in the house?
>
> A   It -- it -- we didn't observe potential mold. Again, I'm not a mold remediation expert. We didn't observe those features. But definitely seeing the apparent termite damage here, yes, the possibility of some water intrusion and/or moisture issues were taken into consideration with that. They often go hand in hand.
>
> Q   So your opinion is the only reduction to be made for visible termite damage and damaged walls in the basement, the mold that my client testified to, that only, it would only affect the price by $20,000?
>
> A   It, it would have a significant reduction of $20,000, yes, sir.

On redirect Mr. Briggs was asked if "the cost to cure that you referenced, is that based on objective criteria, or do you actually go out and get estimates on repairs for houses that need these type of repairs?"   He responded: "We do actually get estimates, in general. Typically, about every other year, we will have a database of different estimates for features such as mold, termites,

8

water intrusion.  Unfortunately, they're estimates.  And oftentimes, they're 15 around $20,000 because there's so many unknowns."

The appraisal report was prepared using a direct sales comparison of three other properties with various adjustments being made and by applying a weighted average to arrive at a value for the property of $240,000.  Additionally, a negative adjustment was made for a $20,000 "cost to cure" estimate for the termite infestation.  Other than the material defect of the termite infestation, Mr. Bowen did not observe any other problems with the residence during his site visit, including mold or water intrusion.  If Mr. Bowen had observed any other problems, Mr. Briggs would have identified them in his appraisal report.  Paragraph 5 of the report's "Statement of Assumptions and Limiting Conditions" states in pertinent part:

> The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied.

The report notes no problems with water intrusion, but rather on page 1 the report describes the foundation as being free from any "Evidence of Dampness," and no mention is made anywhere in the report about mold or water stains on the sheetrock.  As such, the appraisal did not include a "cost to cure" adjustment for the problem with seepage of water through the foundation walls and the resulting dampness and moisture that necessitates the use of a dehumidifier and moisture absorbers.  Nor did it include a "cost to cure" adjustment for the problem with mold and spores that will require removal and replacement of the sheetrock damaged from the floodings.

II.

Section 522(f)(1)(A) of the Bankruptcy Code provides that a debtor may avoid the fixing of a judicial lien on an interest of the debtor in property to the extent such lien impairs an exemption to which the debtor would have been entitled.  The parties agreed to calculate the extent of any

9

impairment of the debtor's homestead exemption by first assuming that the value of the debtor's interest in the property is one-half of the market value of the property, and then subtracting from that one-half value both the debtor's $35,000 homestead exemption and one-half of the $114,123 loan balance secured by the deed of trust, or $57,061.50.  Thus, per the parties' agreed calculation, the impairment of the debtor's homestead exemption will be calculated by subtracting $92,061.50 from one-half of the property's market value.   If the value of the property were $220,000 as the Credit Union asserts, then the debtor's homestead exemption would be impaired to the extent the Credit Union's lien exceeds $17,938.50.  If the value of the property were $185,000 as claimed in the debtor's schedules, motion, and brief, then the debtor's homestead exemption would be impaired to the extent the Credit Union's lien exceeds $438.50.  If the value of the property were $200,000, then the debtor's homestead exemption would be impaired to the extent the Credit Union's lien exceeds $7,938.50.

The fair market value of the property is determined as of the date the bankruptcy petition was filed.  *See* 11 U.S.C. § 522(a)(2).  The debtor has the burden of proof to establish impairment of the exemption.  *See, e.g., In re Pace*, 569 B.R. 264, 269 (B.A.P. 6th Cir. 2017).

> In ruling from the bench at the end of the hearing, the court stated:
>
>> The court finds the value of the debtor's home located at 108 Gilmer Street, Kingsport, Tennessee to be $200,000. Mr. Briggs has appraised the home at $240,000, but estimated the cost of remediation and an entrepreneurial incentive to repair the home's significant termite damage at $20,000, arriving at an appraised valuation of $220,000.
>>
>> The court assigned significant weight to Mr. Briggs' appraisal because of his background, his familiarity with the East Tennessee real estate market, and the methodology used to appraise the home.  However, the court finds the appraisal does not fully take into account the market stigma the home would face because of the existing water and termite damage, the unknown cost of remediation, the unknown status of the termite infestation, and whether it is ongoing, the fact that the flooding remediation is temporary, and the difficulties this would afford the debtor should they attempt to sell the home to a potential purchaser, who may be unable to obtain a loan to purchase the home because of the termite damage.

Using the stipulated amount of the loan secured by the deed of trust and the parties' agreed mathematical calculation for determining impairment, the court concluded that the debtor's

homestead exemption was impaired to the extent the Credit Union's lien exceeds $7,938.50. An order was entered "avoiding the judicial lien in part and fixing the amount of the judicial lien at $7,938.50." The order further clarified that "[t]his partial avoidance of the judicial lien against the debtor's interest in the residence in no way affects the Credit Union's judicial lien on the interest of joint owner Courtney Hart in the residence."

The finding of the fair market value of the property was based on the court's conclusion that in addition to a standard cost to cure estimate for the termite infestation, the property's market value should also include negative adjustments for the property's problems with water intrusion through the foundation walls and the flood-damaged sheetrock that has mold, neither of which was observed by Mr. Briggs and his team. At one point during his testimony Mr. Briggs acknowledged that he had "different estimates and, and printouts based on termite damage, which is often very similar to foundation damage, which is similar to water intrusion" [and that] "[a]ll of those types of issues have a generalized cost-to-cure adjustment that can be applied with reasonable certainty." He went on to agree that each of the problems "are negative market conditions" and "reduce the price down." Yet, he stated that his team had not observed any evidence of water intrusion or mold, and no reference was made to these factors in the appraisal report. As such, the $20,000 standard cost to cure estimate Mr. Briggs applied to the property's value pertained only to the negative market condition caused by the termite infestation. The $20,000 downward adjustment did not include the additional negative market conditions presented by the water intrusion and mold.

Mr. Briggs stated that he had a "database of different estimates for features such as mold, termites, water intrusion…. And oftentimes, they're 15 around $20,000 because there's so many unknowns." In fact, Mr. Briggs' appraisal defines the "cost to cure" estimate for termite damage that he applied to the value of the property as a "standard" cost to cure, i.e., a "standard" $20,000 guess because there are "so many unknowns." However, what was unknown to Mr. Briggs was not unknown to the debtor and Ms. Hart. The debtor and Ms. Hart were far more knowledgeable of the defects in the residence, testifying not only to the termite infestation but to problems with water intrusion and mold that were unnoticed and unaccounted for by Mr. Briggs and his team and that would have had an impact on the property's appraised value had they been observed. The

11

potential impact of these additional defects is evident by Mr. Briggs' statement that if there were moisture issues in the residence, they "could be as small as, you know, fixing guttering and putting a dehumidifier in a basement. It could be as large as exterior renovation excavation. It could, could get extensive. It's just hard to know." Simply put, because Mr. Briggs had no knowledge of the problems in the residence related to water intrusion and mold, he could not have included a cost to cure estimate for each of them—standard or otherwise—in his appraisal report.

In conclusion, if the debtor and Ms. Hart attempted to market the property they would have to furnish to any purchaser "[a] residential property disclosure statement … regarding the condition of the property, including any material defects known to the owner" unless the purchaser waived the disclosure. Tenn. Code Ann. § 66-5-202. The problems with water intrusion and flood damaged sheetrock containing mold are material defects that would have to be disclosed, thereby further reducing Mr. Briggs' appraised $220,000 market value of the property. Mr. Briggs' testimony acknowledged that separate problems with mold, termites, and water intrusion may each reduce the market value of a property by an estimated cost to cure of "15 around $20,000 because there's so many unknowns." Therefore, a reduction of $20,000 in Mr. Briggs' appraised $220,000 value is well below the separate standard cost to cure estimates of $15,000 to $20,000 each for mold and water intrusion that are in his database. The court's resulting $200,000 market valuation represents a 54% appreciation in value for the property over 5 years notwithstanding its problems. The foregoing findings support a fair market value of $200,000 for the property.

# # #